The oral argument this afternoon is number 06-1629 L-3 Communications v. Department of the Navy. Mr. DeVecchio, you reserved four minutes for rebuttal, correct? Yes, Your Honor. And you know how the lighting system works? I do. Okay, you can start whenever you're ready. Thank you. With me is my associate, Mr. Lutzenbosser. Your Honor, this case is about the standard of review on summary judgment. And not merely on summary judgment, but at the confluence of summary judgment and the issue of contract interpretation. The standards, I think, are clear with respect to summary judgment. The appellant is entitled to all inferences in its favor. Is this contract interpretation issue a question of law or a question of fact? It's a question of law, but it can be influenced by the facts as reflected in the decisions in this courtroom. Summary judgment, the standards of summary judgment is not an issue because the question is whether we review de novo. You do review de novo, but you also review- I shouldn't say de novo. Without deference. We do nothing de novo because everything is brought to us. But we review it without deference to the board, right? Yes. On page 30 of your brief, you make the following statement. The board's principal error was one of regulatory interpretation. It failed to understand that the standard pricing clause used by the parties, 48 CFR 52.216-16, operates by setting a total final price that aggregates the prices and costs of all relevance. Do you pronounce that as CLINs or do you have to say CLINs? CLINs will work. CLINs, good. All relevant CLINs, not as the board believed, by setting several stand-alone final prices for each lot. You then say the board's interpretation, but you go through all that, which is an important point in your argument, but you cite no authority for it. That is, no authority other than the regulation itself. Yes. So that basically is your view of what the regulation says. That is, I find no case citation or authority other than your interpretation of the regulation. I'm not challenging at this moment your interpretation, but I want to make sure I'm not missing some piece of law that I need to know about. There is no piece of law that I can direct you to with respect to the interpretation of that portion of the clause. Okay. But I can certainly point you to the interpretation. So the absolute statement that the standard pricing clause operates by setting a total final price should be modified to say, as I read the regulation, the standard pricing clause, right? Well, I would say it a little bit differently. I would say that it is within the zone of reasonableness, which is the standard applied by this circuit, that it is to be read that way, yes. Why should we treat your view of reasonableness different than the government's view of reasonableness? Well, because the cases say that in order to conclude that a clause is unambiguous, which is what the Board of Contract Appeals did, you have to find, particularly on summary judgment, that there is no other interpretation within the zone of reasonableness. And if there is an interpretation within the zone of reasonableness, such as the one that we've suggested in our briefs, you cannot, as a matter of law, find that ambiguous. That's why it's important. Why don't we look at the actual contract, page 154. It seems to me perfectly clear on its face that it provides a separate final price subject to readjustment separately for items 1 to 3 and for item 6. How do you get around that? Well, the question is whether it is what you do with respect to the rest of the options in the contract, options 4 and 2. Answer my question first about 1 to 3 and 7. There are separate final prices for those two. Yes, sir. And I think one could reasonably conclude on the facts, the unique facts of this case, that you could have a separate determination with respect to line item 7, because line item 7 was something that was negotiated uniquely as an aberration because the parties were trying to figure out how you have a cost-plus-award fee line item and a fixed-price incentive fee line item, and they changed the clause to accommodate that. Okay. So it is not the case that this contract provides for a single final total price subject to readjustment because right here it specifies two separate final prices for 1 to 3 and 7, right? I think you could find that that is an interpretation, but that isn't the question. The question is whether on the decisions of this circuit, the question is whether a reasonable interpretation within the zone of reasonableness is that with respect to the remainder of the options, which didn't exist at the time the clause you're reading was put in place, whether those options are to be aggregated and done as a single price provision with all the rest of the options, excluding 7 if you would like. And that's because, well, think about it this way. So we're not anymore dealing with the contention that there's a single total price here because you're saying that 7 has to be put outside that. I think you could read it that way, but I think you could equally read it that way. Well, how can you read it the other way? Because it provides separate prices for 1 to 3 and 7, doesn't it? The fact that it provides separate prices doesn't mean you can't aggregate them for final price provision. But it says final prices. It does say final prices. And let's take another example. If I had final prices in options which weren't in existence at the time this contract was formulated and I look at this clause and it says if I have options, they are to be added to this clause, I would have separate listings that would then be added in a modification to the contract to these totals and I would then have different totals. That's probably what the parties should have done. They didn't do that. And the question then remains, is it reasonable for the parties to have interpreted this with respect to actions that hadn't been taken, options, that those options would be aggregated, totaled with the other line items under A? So what you've got is under A2. It says subject to price provision in accordance with the terms of this clause which will be identified as such in a modification to this contract, right? Yes, that's right. And then the modifications that came after this when the options were exercised had this summary provision giving you a target cost, target profit, target price, and ceiling price for groupings, right? All of which is required by the regulation whenever you have an FPIF contract. So I don't draw any significance from the fact that those things exist within the schedule. It's required by regulation to be placed in the schedule in that fashion. Furthermore, if you wanted to look at that issue, the board seemed to suggest and the government argued, well, the fact that there are separate ceilings in these various portions means that there has to be a separate conclusion or determination with respect to the FPIF pricing. I think that proves quite too much. If you were to look at page 267, which is one of the later modifications to the contract, that's something that's ignored by the government. We started out with a contract clause when there was what they had to deal with at the time, the base contracts. The options hadn't been exercised. The clause contemplates that when options are exercised, you can aggregate them or you can segregate them, but the basic clause provides for aggregation. So that means you have to identify in the schedule what the various factors are. That's required by Part 16.4 of the FAR. Mr. Del Vecchi, you mentioned A267 as an option. I was going to ask you this question. It's always hard when you go through these government contracts when there's options and amendments to know exactly what you have, and I want to make sure two options are relevant here, the option for lot 2 and the option for lot 4A. Is that correct? Well, I think all of the lot 4 options are relevant because the government's contesting how you price lot 4A, lot 4B, lot 4C. Fair enough. I thought 183 of the joint appendix was the option for lot 2. Yes, that was when the option for lot 2 was exercised. And that 191 of the joint appendix at least was the option for lot 4, correct? Yes, it's exercised lot 4A. And then where would lot 4B be? I didn't know which option was, but it's one of them. Is there anything in – I think we could assume that the other options would all be the same language as these here, correct? No, no. Well, that relate to the FPIF type? No, no. The answer, with all due respect, is no. If you were to compare the earlier options and the way they're described, you would see – excuse me. If you were to compare the options as they were described in earlier modifications with how they're described in subsequent modifications, you would see there's a difference. For example, if you look at A267, you will see that unlike the – Wait a minute, wait a minute. Don't go so fast. I've got to find it. A267, okay. You'll see here that you have separate ceiling prices, not simply for the base claims for the lot 4 option, but also for the sub claims. Now, this is a lot – what lot is this? This is 29, which is making revisions to various portions of the contract, and which is, among other things, as you see on page A260, authorizing billing up to the ceiling amounts with respect to lot 4A, and therefore you see changes in 4A to include ceiling amounts. My point is this. If it is the fact of ceiling amounts, as the board seemed to contend, and the government contends, that determines whether there are separate determinations of FPIF pricing, here you have five separate ceiling amounts for lot 4, which you didn't have before in the earlier additions. If you turn to page 264, you have four ceiling prices for lot 2. If you turn to page 263, you have six ceiling prices for lot 1. You have 15 ceiling prices right there when the government is only contending if you have ten modifications altogether. What the government is doing, is it saying we should look to the summary totals in these modifications that exercise the option? Yes, that is one of their arguments. So what's wrong with that? The summary totals are not meaningful in any particular way. The board didn't draw the conclusion, as the government is now arguing, that it was the summary totals. It described it as, apart from other things like a reflect on decision, and that could be the fact of ceilings. My point is, and our point below and here, is that you need the ceilings in the options to compute interim prices which are tracked by line item and subline item. That's the principal purpose, if not the only purpose of the ceilings. So the fact that there are ceilings is of no consequence to the conclusion that there is a reason to have the ceiling independent of the final price. Mr. DiVecchio, let me ask you to step back mentally with me just a step or two. I've seen a lot of these government contracts over the years. I'm sure you have too. I have to say that you made as much out of your government contract as possibly could be done in a very nice brief. My problem looks like this. These contracts are enormously detailed. This has been going on for some four years or so. A lot of people have had a piece of the contract. A lot of different things have happened. There have been any number of changes to it. All of that is true, is it not? If everything had gone well, it would have been wonderful. The only time these cases come to us is when something goes wrong. In this case, what went wrong was Lot 1 was a loser for your client. Isn't that right? You lost money on Lot 1. So what you want to do is figure out a way to wash those losses against the gains you made on the later lots when your client learned how to manufacture this stuff. That's what an incentive is in a contract. Yes, that's fine. Now, here's my question to you. We could spend a lot of time, and appropriately, perhaps going through the trees in the forest and trying to pick the fruit amidst a few things, but the basic question I have for you is where does the risk of loss lie in a contract like this when you contract with the government? How should we allocate the risk of loss for a situation in which the contractor overruns for part of the contract, perhaps for whatever reason. We don't really have that in the record before us. And then figures out how to come within the targets later on. Where does the risk of loss for that initial loss lie? Well, I think your question has a presumption in it that I wouldn't agree with. I think the risk of loss, as articulated in Part 16 of the 4 FAR, is contract-wide. This is a fixed-price incentive contract. That means that for the entire contract. You're begging the question. Well, I think I will answer the question. I don't mean to avoid it, sir. That means that the risk of loss in a fixed-price incentive contract is supposed to be placed fairly on both parties, which is why you have a share line, 75% in favor of the government, 25% in favor of the contract. So you should take 75% of the risk. We take 75% of the loss, and we only get 25% of the gain. Yes, we take the greater part of the risk. And the question then is, is it the norm in these cases? Is it the expectation? Is it supported by a zone of reasonable interpretation to say that the way you allocate that risk is across the entire contract, as opposed to CLIN by CLIN by CLIN? It's a fixed-price incentive contract. It is not a fixed-price incentive CLIN. That is not the government's contention. I understand that's not the government's contention, but that's not the question. The question is whether our interpretation is within the zone of reasonableness, because absent a conclusion that it is beyond, entirely beyond the zone of reasonableness, you cannot find it. I don't understand how your interpretation can be within the zone of reasonableness when the contract itself specifically provides more than a single final price. It provides at least two final prices, one for lots, one to three, and one for seven. I don't think it is in any way contrary to that to say I have a unique circumstance with respect to seven, which the board never looked into the facts of, by the way, on summary judgment, to discern why that was there. It is different from how the parties anticipated. And the uncontroverted evidence was what the parties anticipated, that with respect to everything else, all the rest of the FPI options, it would be aggregated for purposes of the entire contract. I don't find that inconsistent. And as long as it is a reasonable interpretation of the contract, it is something that can't be deemed unambiguous as the court below did on summary judgment. And if you look at the cases in which the issue of ambiguity or lack of ambiguity has, in almost all of them they have taken some look into the facts. Here, responding to your summary judgment question, there are affidavits where L3 personnel said, when this issue first arose, we went to the government and said, this is our experience. This is our understanding. What case says that when you're interpreting the contract, you can go into plural evidence before you get to the point of finding an ambiguity on the face of the contract? I think most of your cases say that, including metric construction. The question is before. Metric construction has been interpreted to only apply in circumstances where there's a specific term that has a unique meaning in the trade. Well, I can address that in a minute, but that's not what metric says. Metric says before arriving at a legal reading of a contract provision, the court must consider the context and intentions of the parties. Furthermore, the tech paradigm case says that in determining whether something is ambiguous or not, the court is entitled to look at certain things. There is, Mr. DiVacchio, a difference, not too subtle a difference, between the rocking chair theory of Professor Corbin, which you just quoted from, which is you put yourself in the rocking chair of the parties and look at the context. There's a difference between that and looking at parole evidence, meaning looking at the way in which the parties talked about the contract after the contract was made. All the evidence you want to bring in relates to the way in which the parties went about performing the contract and talking about it. That's not the rocking chair theory. The rocking chair theory, I was actually quoting this from this court, the metric. Yeah, that's right. Metric uses the rocking chair theory. Nothing wrong with that. It's the time of making the contract. What was the context in which the contract was made? I can't tell from that context which way this case should come out. Can you? If I had had the opportunity at the court below to introduce evidence of what Raytheon had intended at the time of contracting, yes, I think I could have answered that question. But I think I was cut off by summary judgment. And to answer your question about that. What do you mean, cut off by summary judgment? If you had such evidence, why couldn't you submit it in connection with summary judgment? Let me rephrase it. I didn't speak. We did submit evidence in our briefs below with respect to what the intention was by Raytheon. Evidence that suggested, indeed, that they were looking at all of these to be aggregated. It wasn't addressed at all by the board. And to answer your question. It wasn't addressed in your brief? Well, it wasn't part of the decision below. So we didn't address it in the brief. But you will find it in the record, Your Honor. Mr. Budge, one quick. Raytheon is no longer involved in this case. That's correct. They sold the division operating as 2L3. No, I have no further questions. I do have an answer to Judge Plager's question. If you look at the Teg Paradigm case at 465 F1329, it says, although the parole evidence rules bars the use of extrinsic evidence to supplement or modify a written agreement, the rule does not bar the use of extrinsic evidence to interpret the terms of a contract when the plain and ordinary meaning is not clear from the contract itself. And I would suggest to you the plain and ordinary meaning is not clear. Thank you, Mr. DeVecchia. We'll restore your full rebuttal, because you had a number of questions sent your way. So you'll have your full four minutes of rebuttal. Thank you, Your Honor. We'll hear from the government now. Mr. O'Connell. Thank you, Your Honor. May it please the court. This case was a textbook example of a case that was suited for summary judgment at the board, because the only dispute is contract interpretation. Simply put, the government wins here if either the contract is unambiguous or if there's an added ambiguity. Cutting to the chase of this requires me to refer to modification poof 5, which is when the FPIF clause was added to the contract. Where is that? That is at page. Wait a minute. That's right at 154. We have the clause, right? Right. Poof 5 starts at 125, and then the clause starts at 154. And simply put, Your Honor, if Raytheon. But wait a minute. But that clause was part of the contract from the beginning, because the FAR provides that any contract has to carry the basic FAR provisions, right? The fact that the contracting officer failed to write the contract correctly doesn't mean that wasn't part of it from the beginning. Well, if the court applied the Christensen doctrine, the clause would be read into the contract. But then if we're going to apply Christensen, L3's argument is that the fact that this alt 1 was missing is significant. If you're going to read the clause in through a doctrine such as Christensen, you have to read the whole clause in, including the alternate. But whether or not the clause is in or out isn't so much significant as to what it says when it was put in by bilateral modification. And when Raytheon signed this modification, it's simply inconceivable that they signed it thinking that this contract provided for a single aggregate price, but yet they signed this bilateral modification, which calls for two separate final price provisions. But what about the fact that the later modifications at the time of option exercise seem to provide ceiling prices for the individual twins as well as for the groupings, and that you're relying on the groupings? And they say that the provision of the ceiling prices separately for the individual twins and for the groupings creates an ambiguity. What's your answer to that? Well, certainly when Lot 2 was exercised, Your Honor, 2 does have total ceiling prices, but I believe that We're at 185. I'm sorry. I'm at page 185. 2 has separate ceiling prices, but I believe that in the original contract, Lot 2 had, if you look at page 45 of the appendix, 45 does list separate prices for each all the way through. In the original schedule, Lot 4A was the Lot 4 options were. I don't understand the point that you're making. Their argument is as simple, that these option exercise provisions have ceiling prices for individual twins, and then they have a summary section. And that your purpose of the price redetermination clause, you're looking at the summary provisions of the modification and ignoring the individual twin pricing. And they say that creates an ambiguity, because there's an inconsistency. Do we look at the individual twins as a group, or do we look at the summary section as a group? Well, we look at the summary section. Why? Well, it doesn't really matter, because the individual twins add up to the summary totals. No, but their point is that if you apply the price redetermination clause to the individual twins, you get one result. And if you apply them to the summary, you get another result, right? No, I'm not sure if that's the case. Because I think what they're saying is that if you apply the price redetermination to each lot aggregately, you get a different price than if you did each lot separately. I don't even understand what you all are saying. Can you help me? Sure. Why don't you go, you know, in response to his question, why don't you go to one of the options and walk us through it? All right. Well, are you talking about the basic issue in this case? I mean, they're trying to eat lot one. They're trying to get lot one eaten by lumping it in with lot four. Isn't that right? Lot four, all of the different lot four options, yes. Let me see if I can start with the option for lot two, which starts at page 183. Let me just start what it says at page 184. It says at the top in A, the purpose of this modification is to exercise the lot two option. And what's significant about these modifications is what they say and what they don't say. If you look down to paragraph D, B below, it says, as a result of the changes above, the total cost for lot one remains at $34,287. The total cost for lot one at the ceiling is $36,552. You wouldn't expect this modification to use the verb remain, referring to the lot one prices, if there was some kind of aggregate pricing here. What you'd have is some kind of language using a verb like dissolve or something like that. Let me ask you, though, Mr. Connelly, if you go back to 154, where does the... I'm sorry, at 184, you have a price, a total lot one ceiling of $36,552.55, right? Yes. But that's not the ceiling. That's back on 154 in A. How do you get... I think there was some modifications in here that aren't in the record, Your Honor, that raised the price. But what we're looking at here is the option exercise price, right? Yes. And is what you're saying that in subparagraph B on 184, that this is the language that tells you to use the aggregate price for the entire lot as opposed to the individual claims? No, it's not, Your Honor. That's not. I was just making the point, which is that if there was aggregate pricing here, you wouldn't have the lot one ceiling price remaining in effect. Once you exercise an option, the option for lot two, the lot one ceiling price would be meaningless because those, under the aggregation theory, those numbers would be combined and summed up. What we're trying to figure out is whether this contract supports an interpretation, a plain meaning interpretation, if you will, that you are to treat each one of these lots separately for calculating what money is to be paid to the contractor. Isn't that right? Yes. Now, his argument is you can read the contract to allow us to add it all together and come up with a final number. And your argument is, no, you should take it one lot at a time. And we're supposed to discern the answer to that problem by doing what? Reading the contract? Looking at all these numbers? How do we get there? Reading the contract, I think the way I would suggest doing it is start back with the original contract and schedule B. Starting back at page 44 of the appendix, that gives you the lot one prices, and they're separate. And if you move on a couple pages to page 46, it gives you the lot two prices. And they're separate. And you go on and on through ten options, and they're all separate. And so, what I said before, what the contract doesn't say, there's no language in here when the contract was signed that says you add all these things up. By the way, you've used the phrase when the contract was signed, and that raised an issue in my mind while you were talking a minute ago. We were talking with Mr. DiVecchio about the rocking chair theory, which assumes that at the time the contract is entered into, you look around and you take the context. But this contract was amended periodically over and over and over again, creating, in effect, a new contract each time. Shouldn't we, at some point, perhaps way down the line, look back at all the things that were going on and incorporate that understanding into what the latest amended contract looks like? That is, isn't he entitled to get into evidence the way in which the contract was being administered, not as a matter of interpreting the contract, but as a matter of showing what the context of the contract was when it became a contract way down years later? What's the matter with that theory? Well, there's a lot there in that question, but let me try to address it. It was a question, believe it or not. When you're at the trial level and the opposing party moves for summary judgment, you've got two options. You can either ask for a stay and do more discovery, or you can marshal all your evidence and oppose the motion. It's not an option to say, well, give us a trial and we'll come up with the evidence then. L3 hasn't appealed the procedure of the board. They were required to submit all of the evidence that they had with respect to this extrinsic evidence that they allegedly have at the board. They didn't appeal the procedure at the board. They haven't appealed the board's findings of fact. So they have waived any arguments along those lines, Robert. Well, no, they haven't. And in their reply brief, they set out at some length and in quite a bit of detail all the things beginning on page 18. The party's conduct prior to this dispute is relevant, they say, to resolving any latent ambiguity. We don't even need to treat it as resolving a latent ambiguity. We can treat it as understanding the contract. I think they got their evidence in, didn't they? Well, they got their evidence in to a certain extent, Your Honor, but at page 10 of the board's opinion, they considered that extrinsic evidence, and they did not find it persuasive at all. But the answer to Judge Plager's question is that our cases have said you cannot, except in a very narrow circumstance, look to extrinsic evidence to interpret the contract unless it's ambiguous. Right? That's the answer. That's a better answer, yes. Mr. O'Connell, let me ask you. We have it at A154. The clause is it stood for Lot 1, correct? They filled in the blanks in A, in FAR 52.216-16, correct? Yes, Your Honor. Okay. And then you go to what we were just discussing, Modification 14, which is Lot 2, correct? At 183-184? Yes. Is it your position that through that modification, an A was deemed created as it existed on 154 that covered what was the subject of Modification 14? In other words, in effect, are the figures that are set forth on 184, is the operative effect that they effectively became a new A? Do you understand what I'm saying? I mean, in other words, if you had signed… I kept looking around. I say, okay, well, they've had this modification, so now there should be a 17A somewhere that corresponds to the modification. Is that correct or not? When you say 17A, are you referring to… I think it's actually I-7, just what we're talking about. Oh, okay, I-7. Yes. What is going on here is… Wouldn't it have been sort of housekeepingly more complete if when they signed each of these modifications, they said I-7 with respect to Modification Option 2 reads as follows, and they plugged in to I-7 on 154 or a new version of it what we have on 184. Is that correct? I think your interpretation is correct, and certainly you can always, after the fact, think of ways you could have done it better. But here, to the extent that Raytheon didn't understand these, Your Honor, it was incumbent upon Raytheon to ask a question. Well, that's a government matter, but I mean, is that what in effect was supposed to happen, what I just described? That when the modification is exercised, yes, it's read into clause… Part A of that FAR provision. Yes. What is this paragraph on page 184 that refers to I-7? It seems to be an incomplete sentence. I don't know what that means, Your Honor. We could submit a supplemental brief, but I don't know what that first part is. I don't think it's interesting because it refers to I-7. That's one of the problems, you know, this isn't any – you haven't caused this and Mr. Delvecchio hasn't caused it. Gosh, it is frustrating. Some of these people, they're not clear and thorough and precise when they do these contracts, you know, the housekeeping, and it would make a lot of this a lot more certain when we get to court instead of having to – it's not your fault or Mr. Delvecchio's, but the agencies ought to just be very careful and thorough when they do these things. They all ought to be lawyers, that's the answer. No, but you see what I'm saying? You just can't tell exactly what happened. Well, I think you can tell enough, Your Honor, that either it was separate final price determinations that were called for or at the very worst for the government there was a patent ambiguity and the case ends there. I think these contracting officers do the best they can. These are very complicated contracts to administer, and certainly after the fact, if you've got a creative contractor that's looking to recoup some of its losses and can scrutinize the contract very carefully, there's always going to be arguments that clever, creative people can come up with, but that doesn't mean they're correct. But you agree with what I'm thinking. That was the intent here to basically put the mods back into the same sort of, even if it wasn't written out somewhere, what you have at I-7 on 154. And I think that's essentially what happened because I-7a says that if there's going to be further things you're going to do, they're going to be subject to this, just set it out in the mod, which is essentially what they did here, Your Honor. All right, well, you've gone over a little bit, but not quite as much as Mr. DelVecchio's time will be, but we'll give him his full rebuttal. Yes, thank you, Your Honor. Thank you, Mr. Foehn. Mr. DelVecchio, you have your full rebuttal time. Thank you. The question you were just posing about whether that was a possible interpretation, I suggest to you as a question of fact, that is, what was the interpretation? It is a possible interpretation, but it doesn't exclude our interpretation. And if it doesn't exclude our interpretation, it can't be unambiguous. Well, it seemed to me that that's what you would do. When you come along and you add a modification, the cleanest and clearest thing would have been to, you know, draw up another little A like you have on 154, and that was, in effect, the result, but they just didn't draw up another little A. Well, then the question is, what does D mean of the basic clause? D says what you do when you do a price revision is you look at the items in A and you do a total final price, singular, of the items specified in A. So under your theory, they would bring in the things in the modification, they would go into A, and you would have a single, total, final price revision. And, Judge Dike, that also goes to the point that you were making about CLIN 7. If the answer is that CLIN 7 demands separate pricing, then it has to trump the total final price language of Part D of the clause. Part D of the clause contemplates a single, total, final price of the items, plural, in A. The contemplation of the way these are supposed to work is that if you have a contract, take a look at the Aerojet case. Aerojet is not determined on any of the law here, but it's instructive. If you look at the Aerojet case, they had a contract much like this one, where there were research and development in the various courses of production, all under one contract, no options. They put everything together, aggregated, under A for a single, final price determination. When you have options, you don't know which options you're going to end up putting in, so you can't put them all under A. Yes, a good way to do it would be to do what they did in Reflectome and to have a separate clause to say, OK, when we add the modifications, we'll roll them into A. But the clause assumes, as a matter of law, that that's what happens, because it assumes you're going to total the final price of the items in A. So they're imputed into A. It's still a total, final aggregation of everything in A. The board seemed to think Reflectome was right on point. I think Reflectome is on point in our favor, Your Honor. First off, in Reflectome, it wasn't on summary of judgment. And Judge Delman of Reflectome looked at the contemporaneous evidence to determine what the contract meant in that circumstance, which didn't happen here. Secondly, on the point with respect to the evidence that was in the record, the evidence in the record is that when this issue came up, and this is in affidavits, L3 went to the government and said, this is our experience, this is how we think it ought to work, and the government agreed with it. That's powerful evidence that at least ought to have been developed on the record. The government didn't rebut it. The court didn't discuss it. The court didn't afford it in any way at all. It didn't address it. It didn't draw any inference from it. How is it that D supports you? Well, D says, price revision. The contracting officer and the contractor shall promptly establish the total final price of the items specified in A. And the total final... Why should that necessarily mean a single aggregate price? Well, I think total means a sum total. The total final price. You only have a total final price. And these contracts contemplate a total... Well, apparently not in this contract, because in A you've already got two separate prices. And I put them together for a total final price. There's nothing inconsistent with D. That would be a harmonious reading of D. You really want to go back to the board? Yes, I do. And I think that's why I never think we should have been here in the first place. I think that there are all kinds of ways, and the government does an admirable job of posing all kinds of hypothetical ways that you might interpret this or to assess what the companies thought or didn't think. That's a matter of fact to be determined after hearing at the board. It isn't appropriate for summary judgment in a case like this. One thing, Mr. Valle, it does seem that this typo, this incomplete sentence that Judge Dyke found, if you look at page 184, as he says, it says, as a result of this action, contract pages, and one of them is I-7, and then it stops. But I was looking back. If you look at page 305, where we have another, I don't think it's pertinent to, well, no, I guess it is. It's like, well, maybe it is. It says, this is the way it should have been read. It should have read, it says, as a result of this action, contract pages, and they're listed, have been changed. So I think we can assume that what was left out of 184 were the words have been changed. That seemed to be what the typo? Perhaps not. That's all. Thank you, Mr. Avecchio.  The case is submitted.